[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties were married on October 12, 1982 in Stamford, Connecticut. One child was born issue of this marriage, Maximilian Federico Schlubach, born August 21, 1984.
The parties have been divorcing since early 1986. Their first action for dissolution of marriage was brought by the defendant in this action in a complaint dated May 5, 1986 which is Plaintiff's Exhibit #4 in the present action. At that time, the parties were living in Stamford. Thereafter the parties reconciled, relocated to Bridgewater, Connecticut, and the now plaintiff husband filed his complaint for dissolution of marriage dated June 14, 1989. Between that time and the time of trial, this matter has been heavily and unnecessarily litigated.
There has been a claim by both parents for custody of the CT Page 721 minor child. Mediation occurred, as well as a full custody study, and the issue of custody will be the subject matter of a later part of this decision. At the outset, this Court must remark that this was never a custody case. Both parties to this action are found by this Court to have been primarily focused and motivated by monetary concerns rather than the well being of their minor child. (See Plaintiff's Exhibit 20)
This matter was of concern to the Court based on several arrests of one or both of the parties for family violence incidents, as well as several appearances pendente lite on a variety of issues, the most absurd being a requirement by the Court that the parties communicate by fax, and to facilitate communication between father and child, that the child at age 5 1/2 have installed, his very own fax machine.
The Court has twenty (20) exhibits from plaintiff, fifty (50) exhibits from defendant (including Defendant's Exhibit 45, several pages of untranslated German) along with over fifty (50) pages of notes from over seven days of trial.
As to attorney's fees, the plaintiff, now unemployed and dealing with a recently diagnosed bi-polar disorder, claims in excess of Twenty-Eight Thousand ($28,000.00) Dollars, the defendant, who was essentially unemployed outside the home during the marriage claims approximately Fifty Thousand ($50,000.00) Dollars, and the attorneys for the minor child claims approximately Eleven Thousand ($11,000.00) Dollars.
The Court has yet to understand the need for these parties to compromise their child, their integrity, and their marital estate by such a vigorous public airing of rather common marital disputes. Nor is the size of the marital estate commensurate with such a protracted proceeding. Perhaps an earlier diagnosis of plaintiff's mental health status would have given some insight into the motivation behind his part of the conflict. The defendant engaged in that conflict, it appears, to solidify her financial position. It is clear to the Court that there have been enormous losses for all concerned.
The plaintiff's mental health has deteriorated, their finances have seriously declined, and the impact of their folly will have serious long-term effects not only for their child, but for them.
This marriage has irretrievably broken down, and a decree of dissolution of the marriage shall enter.
I CT Page 722
Marital History
The plaintiff was born on March 22, 1934 in Bogata, Columbia, attended schools in Germany, Portugal, and Spain and ultimately joined his father in a family concern in Hamburg, Germany. He completed an apprenticeship in 1954. His father sent him to work in England where he worked at the Bank of London, South America. His father died in August of 1954 and the plaintiff began work in France, working in international trade.
He was first married for twenty-five (25) years and had three children by that marriage. The children were all born and raised in this country and during most of that period he resided in the United States essentially in the New York metropolitan area. The plaintiff husband was divorced from his first wife in 1982 (Plaintiff's Exhibit #1).
The parties met shortly after Easter in 1982. The defendant had met the plaintiff's mother during a brunch and insisted that she call the plaintiff. At that point, the plaintiff was president of a trading company living in Stamford in an apartment. Later the plaintiff purchased a home at 41 West Trail in Stamford. The plaintiff and the defendant had been spending consistent time together and discussed the defendant's move from an apartment in New York. That rental was approximately $1200 per month and the defendant desired to save that money. She also desired to establish a residence in Connecticut. She was going through a divorce at that time and was a precious metals trader earning approximately $50,000 per year. The plaintiff testified that in the summer months of 1982, he discussed marriage with the defendant despite the fact that they had known each other only since April. They were married in October of 1982. She and the plaintiff continued to commute to New York City together.
The defendant is now forty-five years old. She was born in Oklahoma, educated at Harvard, and was employed at Credit Suisse at the time of the marriage. Her brief first marriage, which was childless, ended in divorce.
Shortly after her marriage to the plaintiff, the defendant quit her job. She claimed that the commute, her job pressures as well as housekeeping pressures from plaintiff required her to leave her work.
The plaintiff resented the fact that she was unemployed. He claimed that he had no interest in having a child so late in life, while she testified that the decision to have Max was a joint one. She testified that they wanted to "have product, issue of their great love". (emphasis added) CT Page 723
The plaintiff felt displaced after the birth of Max, and the estrangement between the couple escalated. They began a downward spiral of divorcing and reconciling. The reconciliations were uniformly predicated upon the resolution of financial issues at the insistence of the defendant.
The plaintiff complained that the defendant had a problem with alcohol. If that had been the case, defendant dealt with it during the course of a hospitalization in Texas. The defendant claimed that plaintiff abused alcohol, and that such abuse exacerbated his mental condition. If she had that insight to his condition, she certainly did not appear to be involved in his treatment.
During this roller coaster ride, the plaintiff invested most of his assets in real estate, adding the Bridgewater property to an apartment in Madrid he had owned well before the marriage, a home in Monserrat, in Vermont, and lastly an apartment in which to reside post-separation, in New York City.
Throughout that time, the parties lived, materially, a full life. Up until almost the time of trial, the plaintiff had sufficient assets to maintain most debts, both from his first marriage, as well as current liabilities.
During the time of trial, plaintiff's physical health deteriorated along with his mental health. The defendant has pursued her studies at the Yale Divinity School deciding to minimize her earning capacity. Her health is apparently good, though she did have major surgery during the marriage, but after the birth of their child.
During the term of their volatile marriage, the plaintiff began a rather open affair with Gloria Macias, who became his fiance prior to the parties' separation. The liaison occurred following the first writ for dissolution between these parties and appeared to the court to result only from plaintiff's desperation and his disease. Ms. Macias was truly a symptom of this breakdown, rather than a cause. The plaintiff was rather cruel, however, in his display of this relationship, not only to the defendant, but more importantly, to Max.
CUSTODY
The Court finds that it is in the best interest of the minor child Max, that he be in his mother's custody. The Court finds that joint custody is inappropriate in this case, but hopes that the parties can work toward that goal once the ever important financial issues are over. CT Page 724
While the parties seemed to want to agree on joint custody, and while it was recommended in his written report, many caveats were expressed during testimony by Stephen R. Grant, Family Services Supervisor who prepared the custody evaluation. The attorney for the minor child further recommended that joint custody would be inappropriate for people who needed fax machines to communicate.
The court has reviewed Dr. Horowitz's evaluation, which exhibit was ordered sealed and shall remain so. The most hopeful part of this entire matter is the intelligence and potential of his darling little boy, who characterizes his parents actions as "childish".
The concerns expressed by Mr. Grant are textbook reasons not to elect joint custody. Fundamentally, the plaintiff desires to significantly reduce, if not erase, the role of the defendant in the child's life. The plaintiff and defendant do not agree on how Max should be educated or raised.
In addition to their volatile marriage and divorce, the parties are not necessarily inclined to live in close proximity to each other. The plaintiff's European connections and predilections could occasion long term separation from one or both parents.
Neither parent has been very child-centered in dealing with their divorce. If, as generally understood, bi-polar disorder is hereditary, then Max is at risk for symptomatology of the disease. He needs to have supportive parents who will counsel him to appreciate the disorder and encourage treatment of it. The defendant has some insight at this time. It may be that after treatment, his father can be of legitimate assistance to him. The defendant further has appeared to the court to have the ability to foster a relationship between child and father. Because of her most recent educational program, it is the court's belief that she may be able to make developmental transitions with Max.
Nothing in this opinion should be construed to negate the positive role that plaintiff could yet play in Max's life. He has already greatly enriched his life, and because of his wealth of life experiences, his involvement will be key to Max. Liberal and flexible visitation is essential for Max, as well as the parties. Their schedules and residences are not suitable for set visitation orders by this Court.
To facilitate life for Max, it is the Order of the Court that defendant engage in counseling as described in paragraph 5 of Mr. Grant's recommendation in the custody study for "goal directed therapy that emphasizes parenting obligations and priorities". CT Page 725
The Court further Orders the plaintiff to include in his treatment plan, anger issues directed at defendant.
The Court did see some encouraging signs during this litigation that lead the Court to believe that these parents can communicate with respect to Max's needs. Now it is up to them to do that.
CHILD SUPPORT
The plaintiff is ordered to pay $300.00 per week as child support. He is to continue to pay for the Bridgewater Montessori School, and the cost of private education until the child is eighteen. The order with respect to private education is predicated upon academic performance by Max justifying the expense. The Court will find an arrearage of child support in the amount of $5,600.00. It shall be paid in sixty (60) days.
MEDICAL INSURANCE
The plaintiff is to maintain medical insurance for the benefit of the minor child and pay all unreimbursed health related expenses, including counseling. Any health related debts for the benefit of the minor child on the parties financial affidavits shall be paid within ninety (90) days, by the plaintiff.
UGMA PROPERTY
The child shall retain his educational trust with defendant as trustee. The plaintiff shall maintain for the benefit of the child the lot adjacent to the Monserrat home. If the Monserrat home is sold, and a fair market value offer for that lot is made, then any sale proceeds shall be added to the educational trust.
PERSONAL PROPERTY
The minor child shall retain all personalty in his room, as well as, an Arrowback Rocker, a Victorian Rocker, L.L. Bean Rocker, and the Steinway Piano. The proceeds of the sale of any of these items shall be added to the educational trust.
DISTRIBUTION OF MARITAL PROPERTY
A review of financial affidavits from earlier proceedings all of which are exhibits in this case discloses that the plaintiff was well-employed. (See Plaintiff's Exhibits 5 and 6, Defendant's Exhibits 11 and 12.) He had some nominal bank accounts and approximately One Hundred Eighty Five Thousand ($185,000.00) Dollars in stocks and bonds in 1981. By the filing of the 1986 CT Page 726 Stamford divorce, little had changed save the acquisition of a marital home.
Thereafter, the parties moved to Bridgewater and the plaintiff left long-term employment taking a lump sum retirement distribution of approximately Four Hundred Thousand ($400,000.00) Dollars, after the Company closed. He was immediately reemployed at Considor, Inc. His salary at Considor was somewhat reduced. However, he received a Seventy Thousand ($70,000.00) Dollar distribution from a foreign trust, based upon an earlier employment. He alleged that he funds were utilized to improve the Bridgewater home.
He maintained employment in New York until September of 1989, when he began his own business, alleging income of Ten Thousand ($10,000.00) Dollars per month (Defendant's Exhibit 13). This period of time coincides with Dr. Sobo's assessment that the Plaintiff was in a manic phase of his illness (Plaintiff's Exhibit 11).
The Plaintiff decided in 1989 to take what remained of his stock portfolio and invest in real estate. The property he purchased in Monserrat in May of 1989 was hit by a hurricane and seriously damaged. The Vermont property purchased to develop into a bed and breakfast, remained, according to the Plaintiff, in its unchanged state. Many of the properties were significantly leveraged, and the decline in the real estate market has further compromised these assets.
Since plaintiff's hospitalization during trial, his ability to earn has been seriously compromised.
The defendant remained unemployed outside the home during most of the marriage. While she has demonstrated earning capacity, she was elected to attend Divinity School, with part-time employment only, at slightly over minimum wage. The defendant entered the marriage with minimal assets and some debts. She did not contribute financially in any significant way to the acquisition of assets. Her contribution to the marriage and life style of the parties must be recognized, however. Much of the friction between these parties resulted from the plaintiff's unwillingness to acknowledge that contribution.
While the defendant may not be in the best position to acquire assets in the future, she certainly appears, at this point, to be healthier, and more readily employable.
After assessing all statutory factors with respect to the distribution of the martial estate, the Court enters the following orders: CT Page 727
 1. 191 Christian Street Bridgewater, Connecticut
Pursuant to Connecticut General Statutes Section 46b-81, the Court transfers all of the plaintiff's interest in and to the subject property to the defendant. The defendant shall pay and hold the plaintiff harmless from the first mortgage on the subject property. With respect to the second mortgage on the subject property, the parties shall each be responsible for the payment of one-half of the mortgage. If defendant sells the marital home and pays the plaintiff's share of the mortgage, then plaintiff shall reimburse the defendant within sixty (60) days of said conveyance.
 2. Chez Mango Monserrat
The subject property shall remain the sole property of the plaintiff. He shall pay and hold defendant harmless from any mortgage or other carrying range on the subject property.
3. Other real estate held in the name of the plaintiff shall remain his sole property. Any liabilities incident to those properties shall be the responsibility of the plaintiff and he shall hold the defendant harmless therefrom.
4. All closely-held corporations owned or controlled by plaintiff, or whose stock is owned or controlled by plaintiff shall remain his property. The value of these corporations is found by evidence addressed at trial to be either zero or of nominal value.
5. All bank accounts, stocks and bonds, pension funds, or IRA's shall remain the property of the party holding share.
6. Motor vehicles owned by the parties were distributed by agreement during the course of trial.
7. Personal property has been distributed pursuant to the agreement of the parties as Defendant's Exhibit 50 attached hereto.
To secure the hold harmless orders in this decree, transfer of personalty to plaintiff shall not occur until those orders have been complied with. Any transfer of personalty to plaintiff shall be at his expense.
ALIMONY
No alimony shall be paid by either party to the other. CT Page 728
MEDICAL INSURANCE
The plaintiff shall cooperate with the defendant with regard to a COBRA rollover to her from plaintiff's existing group medical insurance coverage.
ATTORNEY'S FEES
Each party shall pay their respective attorney's fees. They each made independent decisions on how to litigate this matter, and they shall be responsible for that decision.
MISCELLANEOUS ORDERS
The plaintiff shall pay the balance of the Shich — Shadel Hospital bill, any balance due the Patton Montessori School, and the arrearage accumulated on the first mortgage on the Bridgewater property from the time of separation to date of judgment.
The plaintiff shall pay two-thirds of the counsel fees for the minor child and the Defendant shall pay one-third of the counsel fees for the minor child.
Judgment shall enter in accordance with this opinion.
DRANGINIS, JUDGE